IN UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Miguel Guerrero, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 22-cv-6613 |
| DYWIDAG Systems International, USA, Inc., a New York Corporation, DSI Holding USA Inc. Profit and Retirement Plan, Mike Kelley and Crystal Soldan, plan administrators, | ) ) ) ) ) ) ) | Class Action |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, Miguel Guerrero, brings this action against Defendants for multiple violations of the Employment Security and Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA") on his own behalf and on behalf of all other similarly situated participants in the retirement and profit-sharing plan.

## PARTIES

1. Miguel Guerrero is an individual and citizen of Illinois and resides in Hinsdale, Illinois.

2. DYWIDAG Systems International USA, Inc. is a New York corporation with its principal place of business in Bolingbrook, Illinois.

3. Defendant DSI Holding USA Inc. Profit and Retirement Plan (the "Plan") is an employee benefit plan under ERISA. On information and belief, the Plan is administered in Bolingbrook, Illinois.

4. Defendant Mike Kelley, on information and belief, is either Plan administrator or one of the Plan administrators.

5. Defendant Crystal Soldan, on information and belief, is either Plan administrator or one of the Plan administrators.

6. Plaintiff believes there are potentially other, yet unnamed, Plan administrators or fiduciaries. Due to Defendants' failure to comply with the requirements of ERISA, these individuals have yet to be identified. Plaintiff will amend this Complaint when these individuals have been identified through discovery or other means.

## JURISDICTION AND VENUE

7. This Court has jurisdiction for this case under 28 U.S.C. § 1331 as this matter is brought pursuant to ERISA and 29 U.S.C. § 1132(e) provides subject-matter jurisdiction over the ERISA claims.

8. This Court has personal jurisdiction over the Defendants because they all have minimum contacts with, and purposefully avail themselves of the benefits, of this jurisdiction.

9. This District is the proper venue for this case because Defendants reside in, and are subject to, suit in this District. Furthermore, a substantial portion, or perhaps all, of the events that underlie the claims here occurred in this District.

## STATEMENT OF FACTS

10. Miguel Guerrero began working for DYWIDAG Systems International USA, Inc. ("DYWIDAG") in 1988.

11. In 1991, DYWIDAG established the DSI Holding USA Inc. Profit and Retirement Plan (the "Plan").

12. The Plan is a defined contribution plan for employees in DSI Holding USA, Inc., DYWIDAG Systems International, USA, Inc., DSI Tunneling, LLC and DSI USA, LLC (collectively, the "Company").

13. Plaintiff has been, and is, a participant in the Plan.

14. Under the Plan, participants make pre-tax salary contributions to individual retirement accounts.

15. The first 2% of employee contributions are matched at 100% (the "Matching Contribution").

16. Additionally, the Company contributes an additional 3% of an employee's compensation, regardless of any amounts an employee elects to defer (the "Safe Harbor Contribution").

17. American United Life Insurance Company is the custodian of the plan assets ("AUL"). It is also known as One American.

18. Plaintiff made elective deferrals to the Plan which entitled him to the full Matching Contribution. Between the Safe Harbor Contribution and the Matching Contributions, the Company was to contribute 5% of his compensation to his Plan account.

**Defendants' History of Mismanagement of ERISA Benefits**

19. Defendants have a long history of mismanaging a range of employment benefits provided to Plaintiff, to the point where it is difficult for a reasonable person to be confident of anything they say or do in terms of benefits. Plaintiff has repeatedly been given incorrect information about his benefits. Defendants have, after denying any error, or professing an

inability to respond to Plaintiff's inquiries, admitted that errors have been made. Plaintiff reasonably mistrusts information provided by Defendants.

20. For example, Plaintiff had dental insurance through the Company for his family. As with all health benefits, the dental plan is a welfare benefit plan that must comply with ERISA.

21. In June of 2020, Plaintiff received notice from the dental insurance company that his son was no longer eligible for coverage because he was 26 years old. However, someone at the Company entered Plaintiff's son's birthday incorrectly, making him appear to be two years older.

22. Plaintiff contacted Defendants, which acknowledged the error. On June 15, 2020, Defendants responded that the error had been fixed.

23. A year later, when seeking dental treatment, it was discovered the error had not been fixed, forcing the son to forego dental treatment. When contracted, Defendants stated they needed a birth certificate to make the change "permanent," something never previously requested. When Plaintiff requested a copy of the enrollment, to determine if they had this time stated his son's birth year correctly, Defendants ignored the request.

24. Although the birthdate was ultimately corrected, in July of 2022, Plaintiff contacted Defendants because his dentist informed him that now the dental insurer had not processed any claims, of any covered family members, for three months' worth of claims. Guardian, the insurance company, informed Plaintiff that Defendants had not paid the premiums, despite dental insurance premium money being deducted from Plaintiff's check weekly.

25. Defendants' vague and somewhat garbled reason for the premiums not being paid was "there was an internal issue that prevented Guardian from posting our payments and this caused delayed [sic] in submissions."

26. The Company also offered employees such as Plaintiff a health Flexible Spending Account ("FSA"). These accounts allow employees to use pre-tax dollars to pay for certain qualified medical expenses. Health FSAs are an employee welfare benefit plan and must comply with ERISA.

27. In 2021, Plaintiff opened a flexible spending account through the Company. Plaintiff elected to defer $3,000 annually, which was deducted from his paycheck. However, only $2,750 actually showed up in Plaintiff's FSA account. It was only when Plaintiff inquired in February 2021 about the missing funds that the problem was rectified.

28. The Company also offered life insurance to employees. Life insurance, including supplemental policies, is governed by ERISA.

29. During open enrollment in 2020, Defendants offered Plaintiff the opportunity to purchase additional supplemental life insurance. He elected to increase coverage to $300,000. At the start of 2021, Defendants began deducting premiums for the increased coverage. In mid-January, Plaintiff requested proof of coverage. In response, Defendants claimed Plaintiff had filled out the incorrect form and instructed him to complete a new one. After completing the new form, in April, Plaintiff was informed for the first time that he wasn't even eligible for this supplemental coverage, despite Defendants having deducted the premiums from his pay for four months. Eventually, Plaintiff's money was returned to him.

**The Administration of the Plan**

30. In April of 2021, Plaintiff noticed missing Safe Harbor Contributions to his 401(k).

31. Plaintiff contacted Defendants on April 20, 2021 and was told to contact the custodian, AUL.

32. There were multiple exchanges of emails regarding missing contributions but no resolution.

33. In summer 2021, still with no resolution, Plaintiff received two different Plan statements—both for the month of June—from AUL for his account. These two June statements showed different amounts in his account, with no explanation of why.

34. On August 14, 2021, Plaintiff contacted Defendants in an effort to get to the bottom of the discrepancy.

35. Defendants offered no explanation and stated that, from the beginning of 2021 through the present day, all Matching and Safe Harbor Contributions had been timely made.

36. On August 30, 2021, Plaintiff again wrote to Defendants, noting again that there were missing employer contributions. Again, nothing was resolved.

37. In February 2022, Plaintiff again contacted Defendants about the missing contributions, noting his continued inability to get any answers.

38. Later that month, still having no answers, Plaintiff sent Defendants a statement he received from AUL for the first five weeks of the year. It showed dramatic underpayment of employer contributions, both Matching and Safe Harbor, to Plaintiff's account

39. Subsequently, Defendants admitted the mistake with respect to the Matching Contribution. By Defendants' own admission, this error occurred with the accounts of multiple

employees. Defendants claim this was corrected and that a notice about this was sent to all employees. Plaintiff asked Defendants for a copy of the notice supposedly sent, but Defendants said they didn't have one.

40. On April 21, 2022, Plaintiff laid out for Defendants the prior three quarters of employer contributions and noted that the Safe Harbor Contributions *still* were significantly less than what they should have been.

41. On April 23, 2022, Plaintiff presented his pay stub and AUL account statement through April 22, 2022 to Defendants. While the paystub showed the Safe Harbor Contribution being made, no such contribution was reflected in the AUL account statement.

42. That same date, Plaintiff yet again contacted Defendants regarding the Safe Harbor Contributions for the year ending 2021. Plaintiff provided his year-end paystub, and now pointed out that the 2% employer match listed on it was substantially higher for the year than the 3% employer contribution, a mathematical impossibility. No explanation was forthcoming.

43. Plaintiff later prepared a lengthy email to Defendants detailing the missing contributions.

44. Defendants responded that they had requested the transaction records from AUL.

45. On April 27, 2022, after inquiring himself to AUL, Plaintiff wrote Defendants to notify them that AUL did not have any additional information beyond screenshots of what had been deposited and did not have access to necessary information from Defendants' payroll processor ADP.

46. Exchanges continued between Plaintiff and Defendants. Without explanation, and despite the continued mathematical impossibility of the 2% employer match being substantially

7

higher for the year than the 3% employer contribution, Defendants maintained that both Matching and Safe Harbor Contributions had been timely made in full for all of 2021.

47. On August 22, 2022, however, after repeated denials, Defendants belatedly admitted they in fact *had* make a mistake with respect to the Safe Harbor Contribution and had underpaid them.

48. On August 23, 2022, as part of his continued efforts to get to the bottom of the situation, Plaintiff requested a copy of the summary plan description. The following day, in response to his request, Defendants sent the document attached hereto as Exhibit A.

49. Subsequent to Defendants admitting errors and failing to timely deposit contributions, they deposited unannounced some additional money into Plaintiff's account. Defendants, however, failed to respond to Plaintiff's request for an explanation or accounting of these deposits and have failed to state or prove that they deposited the correct amount.

50. In September 2022, Plaintiff terminated his 34-year employment with Defendant DYWIDAG. Defendant DYWIDAG tried to persuade Plaintiff to stay by telling Plaintiff that if he left, the still unresolved issues with respect to his benefits would "go to the bottom of the bucket." He was subsequently paid his accrued vacation pay, albeit weeks late in violation of the Illinois Wage Payment Act.

51. Defendants did *not* pay into Plaintiff's account the required Safe Harbor or Matching Contributions corresponding to his accrued vacation pay.

8

**Class Allegations**

52. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and a class of similarly situated persons injured by Defendants' unlawful conduct. The Class is defined as follows:

> All participants and beneficiaries in the DSI Holding USA Inc. Profit and Retirement Plan from November 28, 2018 to the present.

53. Pursuant to Fed. R. Civ. P. 23(c)(5), Plaintiff seeks two subclasses:

> Subclass 1: All participants or beneficiaries in the DSI Holding USA Inc. Profit and Retirement Plan who were entitled to employer contributions, whether safe harbor or matching.
>
> Subclass 2: All participants who terminated employment with sponsoring companies of the DSI Holding USA Inc. Profit and Retirement Plan.

54. The Class members are so numerous that joinder of all members is impracticable. Upon information and belief, the Class includes over 200 members. And each subclass contains at least 25 individuals.

55. Questions of law and fact are common to the Class and these common questions predominate over any questions affecting individual members. Common questions include:

> a) whether the Defendants failed to follow the Plan;
>
> b) whether the Defendants failed to make timely contributions to the Plan;
>
> c) whether the Plan administrator has violated ERISA by failing to adequately maintain Plan records;
>
> d) whether the Plan administrator has violated ERISA by failing to distribute a summary plan description compliant with ERISA and 29 CFR § 2520.102-3 to the Class;

   e)  whether the Plan administrator has breached its fiduciary duties by account for the assets of the Plan.

56. The claims of the representative parties are typical of the claims of the Class.

57. Plaintiff will fairly and adequately protect the interests of the Class.

58. Plaintiff's counsel are experienced class action attorneys.

59. A class action is appropriate in this case under Rule 23(b)(1) because the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants or adjudications as to individual class members that would affect the interests of other class members not parties to the adjudications.

60. A class action is appropriate under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class and the Subclasses, making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class and Subclasses.

61. A class action is appropriate under Rule 23(b)(3) because common questions of law or fact predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this case.

62. A class action is also the superior method for the fair and efficient adjudication of this dispute.

## COUNT I
### Recovery of Benefits – ERISA § 502(a)(1)(B)

63. Plaintiff restates and re-alleges the foregoing paragraphs as if fully set forth herein.

64. ERISA § 501(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary of a plan to bring a civil action to recover benefits due under the terms of the plan, to enforce his rights under the terms of the plan, and to clarify his rights to future benefits under the plan.

65. Pursuant to the Plan, Plaintiff and the Class were entitled to Matching and Safe Harbor Contributions.

66. These contributions have not been made as required by ERISA.

67. In addition, terminated employees have not received the contributions due to them related to liquidation of accrued vacation time.

68. Accordingly, Plaintiff asserts this claim on behalf of himself and the Class to enforce their rights under the terms of the Plan and to recover those benefits due to them under the terms of the Plan.

## COUNT II
### Breach of Fiduciary Duty – ERISA § 502(a)(2)

69. Plaintiff restates and re-alleges the foregoing paragraphs as if fully set forth herein.

70. Defendants are fiduciaries to Plaintiff and the Class under ERISA § 3(21)(A), 29 U.S.C. 1002(21)(A), based on the discretionary authority and responsibilities they assumed and/or were granted for administering the Plan.

71. ERISA § 502(a)(2) authorizes a participant or beneficiary to bring a civil action to obtain appropriate relief for breaches of fiduciary duty on behalf of a plan to hold the breaching

fiduciary personally liable to make good to such plan any losses to the plan resulting from each such breach and any other equitable or remedial relief as the court may deem appropriate.

72. Defendants failed to ensure that Plan assets were properly deposited and accounted for.

73. In so doing, Defendants have failed to discharge their duty to act "solely in the interest of the participants and beneficiaries" and exclusively for the purpose of providing and administering benefits to Plan participants and beneficiaries.

74. In so doing, Defendants also failed to act in accordance with the documents and instruments governing the Plan.

75. Defendants also failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing of a prudent man acting in a like capacity.

76. As a result, the Plan has suffered losses from, inter alia, contributions from the Plan sponsor and the profits those contributions would have accrued as Plan assets.

77. Accordingly, Plaintiff asserts this claim on behalf of himself and the Class, and on behalf of the Plan, to hold Defendants personally liable to make good to the Plan the losses resulting from their breaches of fiduciary duties, as well as declaratory and injunctive relief to enjoin the illegal practices of Defendants described herein, to obtain an accounting, replace the fiduciary, and to obtain such appropriate equitable relief as may be necessary under the circumstances.

## COUNT III
### Breach of Fiduciary Duty – ERISA § 502(a)(3)

78. Plaintiff restates and re-alleges the foregoing paragraphs as if fully set forth herein.

79. ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a civil action "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

80. Pursuant to the Plan, Plaintiff and the Class were entitled to various contributions from Defendants to their retirement accounts.

81. Defendants failed to make the necessary and timely contributions.

82. Plaintiff seeks declaratory and injunctive relief on behalf of himself and the Class to enjoin the illegal practices of Defendants described herein, and to obtain such other appropriate equitable relief as may be necessary under the circumstances recognizing their rights to those benefits.

## COUNT IV
### Violation of ERISA § 104, 29 U.S.C. § 1024
### Failure to provide summary plan descriptions

83. Plaintiff restates and re-alleges the foregoing paragraphs as if fully set forth herein.

84. ERISA § 104, 29 U.S.C. § 1024 requires a plan administrator to distribute to each and every participant or beneficiary a "summary plan description" of the Plan (commonly referred to as an SPD). This is a plain English explanation of the Plan terms.

85. ERISA requires SPDs to inform participants, among other things, of what their rights and responsibilities under the Plan are. For example, for this Plan, the SPD should apprise

13

the participants of how to calculate their pension benefit, at what age the participant can receive payment, and in what form the participant can take his pension, e.g. as an annuity or a lump sum.

86. ERISA requires that SPDs be provided every five years when there is an amendment to the plan, or every ten years if there is not, to participants and beneficiaries. ERISA § 104(b), 29 U.S.C. § 1024(b).

87. But the Plan administrator defendants have failed to provide a compliant SPD.

88. The Class therefore seeks relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) which provides appropriate equitable relief to redress violations of the statute.

WHEREFORE, Plaintiff, on behalf of himself, the Class, and the Plan, demands judgment against Defendants, for the following relief:

(a) an Order declaring this action to be maintainable as a class action and appointing Plaintiff as the representative of the Class and his counsel as counsel for the Class;

(b) a declaratory judgment that Defendants have breached their fiduciary duties to Plaintiff and the Class, in violation of 29 U.S.C. § 1104;

(c) an order enjoining Defendants from continuing to engage in the breaches of fiduciary duty and violations of law described herein;

(d) an accounting to the Plan of the monies that would have been contributed to the Plan and the profits such monies would have generated but for Defendants' breaches of their fiduciary duties;

(e) disgorgement, restitution, and/or restoration to the Plan of the monies that would have been contributed to the Plan and the profits such monies would have generated but for Defendants' breaches of their fiduciary duties;

(f) pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(i) The maximum daily statutory penalties;

(j) Attorneys' fees, costs, and other recoverable expenses of litigation; and

(k) Such further and additional relief to which Plaintiff, the Class, and the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

Respectfully submitted,

*/s Matthew Hurst*
Matthew Heffner
  mheffner@heffnerhurst.com
Matthew Hurst
  mhurst@heffnerhurst.com
**Heffner Hurst**
30 North LaSalle Street, Suite 1210
Chicago, Illinois 60602
Phone: (312) 346-3466

Charles Watkins
  cwatkins@gseattorneys.com
**Guin, Stokes & Evans, LLC**
805 Lake Street, Suite 226
Oak Park, Illinois 60301
Phone: 312-878-8391

**Attorneys for Plaintiff**